Appeal 1567 from 2008. Mr. Wolfe, good morning to you. Please proceed. Good morning, Your Honor. May it please the Court, I'll begin where the brief begins with the 294 patent. And there is no dispute that as written, Sonosite's products infringe the asserted claims. Those products have a B-mode image, the classic ultrasound image we're used to seeing on television, the gray scale. There's no dispute that there's a small region of interest box that can display blood flow. And there's no dispute that when that box is moved, as the claims call for, that the B-mode image is visible at all times. Where's the error? That's the point of concern here. Where's the precise error by Judge Krebb in your view? There are two errors. They're distinct. They're related, but they're distinct. The first is finding that the color must be in place of the blood, the B-mode, excuse me, the B-mode must be in place of the color when the region of interest is being moved, which isn't called for in the claims. There's no mention of what happens to the color in other words, in the actual product. I thought she depended on various points in the specification to support both those conclusions. So what's wrong with looking to the specification to understand the scope of the claim? Your Honor, as to the always and never limitation, there's no reference anywhere in the specification to that. That's an add-on, a very important add-on to the claim construction, but there's no textual support for that. So let me focus on where the and that's with reference to the in place of limitation, that the B-mode is in place of the color image when moving. We acknowledge, Your Honor, that that appears in the summary of the invention. And we acknowledge that there are times that this court has found that you should import language from the summary of the invention into the claims. But this case doesn't have the indicia of when that's appropriate. First of all, there was no ambiguity in the language. In fact, if you compare the asserted claim with the claim construction, the words appear again, undefined. It's simply an added-on limitation. There was no ambiguity in any of the words as written. Secondly, there's no suggestions in the... When you say there's no ambiguity, I'm not sure what you mean. Some people would say that all words in every sentence are ambiguous until you understand the context. All interpretation is Well, if it is, Your Honor, then the court didn't resolve the ambiguity because the court took the language of the claim, repeated it in its claim construction, and then added words that are limitations, that are additional requirements of the claim. They don't construe the claim at issue. They're add-ons. They're tack-on limitations. And in this case, there's nothing in the patent... In the SIMED case, for example, Your Honor, the court found that there was an express disclaimer that this patent, the SIMED patent, says this kind of catheter... No one is urging that that's the case here, so why get into that? Well, because that's the only context, I believe, or at least the only typical context, where the court has said it's appropriate to import language when you're not construing claim terms. There's only really two times you can import something from the summary of the invention, at least in the typical circumstance. One, you're construing ambiguous language, or two, there's something that amounts to a disclaimer, either in the specification or the file. Well, if you're right, you win. I'm not so sure it's that limited, but maybe... Well, with that, Your Honor, I'd like to just briefly turn to the doctrine of equivalence issue, even if the in-place-of language and the always-and-never language are used. In the sonocyte-accused device, it is only in the brief period where the moving box overlaps with where the old box was that there's any mode and color at the same time. Anywhere else on the screen, it's just the B mode. It would satisfy sonocyte's limitation. Even if the district court's construction were accepted in its entirety, there still was a factual issue on the doctrine of equivalence that should have been addressed. Based on what? I mean, what evidence poses an issue that can only be resolved by trial? The question of whether it constitutes a defeat summary judgment, you need evidence. What's the precise evidence that shows that there's an issue that only a jury should decide? For example, Your Honor, Dr. Peter Burns, who's one of the world's leading ultrasound engineers, was the expert on behalf of GE in the case, and he submitted substantial testimony in the form of declarations, reports, and also a deposition under a classic function-away result analysis, under the doctrine of equivalence. The court simply disregarded that function-away result analysis, and that's a fact inquiry I believe we were entitled to take to the jury, even if the court upholds in its entirety the claim construction of the district court. And there's no dispute that if the court disagrees with the district court's claim construction. Well, what if I'm the expert witness, and I say, not in this case, but some other hypothetical case, I say the function, way, and result are substantially the same. Is that a magic bullet that always and everywhere defeats summary judgment just because some witness says function, way, result? No, Your Honor, because Daubert allows the district court to strike testimony that's considered conclusory. If there's no reasoning behind it, the district court is free to say, I'm not going to let you take that to the jury. But there was no such Daubert finding in this case that the court simply said we claimed it was similar, and that's not what the underlying testimony is. There are pages and pages of reports and declarations and deposition testimony. If there had been a Daubert challenge, a former Daubert challenge, we believe we'd have no problem. Let's not talk about what's not in the case. If there's no Daubert ruling here, let's not worry about Daubert. All right. Well, with that, Your Honor, I'd like to move on to the 859 patent, GE's 859 patent. And again, unlike the previous case where we believe that reversal is mandated, in this case we're simply asking for vacature and remand. Again, Dr. Burns testified on the 859 patent that each and every element of the asserted claim was met. And again, we have detailed reports, detailed declarations, and pages and pages of deposition testimony upon which we're relying. In this case, there was one specific limitation, although it has related add-ons, the noise model limitation, where the district court said, I find that's not here. Now, the problem with this is the court said that she disregarded certain findings because of the format of the findings. The format of GE's affirmative findings were. We're aware of 240 and the linguistic tango there. Right. The flip side there, what's not necessarily clear is that in opposing, remember, this is a summary judgment motion on us. In opposing those findings, GE disputed them and cited to the same underlying testimony. And in those disputed findings, there was no such tangle, as Your Honor put it. The statement was laid out, and I'll just point the court to Joint Appendix 21590, findings of fact 423 through 427. And they refer underlying to Dr. Burns, for example. And these were phrased in the way that the court should have found acceptable. The fact is X, not Dr. Burns testified the fact is X. Now, we don't know whether the court simply didn't notice these findings. We don't know whether the court rejected them for some other format purposes. Or we don't know whether the court substantively rejected them. But in any event, those findings of fact, or rather those disputes to those finding facts, alone should mandate that summary judgment be denied. And that a jury be allowed to evaluate Dr. Burns' testimony and the related evidence regarding whether a noise model was used here. And I would suggest... Well, wasn't Judge Crabb relying on a conception of what a noise model would have to constitute? She was using language like it's a construct and so on. So I guess the question is, well, what's wrong with that analysis? What's wrong, Your Honor, is that she focused on the wrong question. In her opinion, she talks about what the engineers were doing. They were using trial and error. But the claim isn't about what the engineers are doing. The claim is what the computer is doing, what the algorithm is doing. And so the question is not, were the engineers predicting according to a noise model? The computer predicting according to a noise model. The evidence from Dr. Burns is that it was, that the computer took the number, just like, Your Honor, if I wanted to come up with an investment program. My understanding was that her ruling was based on her construction of the claim and that it wasn't disputed that if that construction were correct, you lose. So I thought the focus of your argument was that her construction was wrong. But now it sounds like she misunderstood the facts rather than misconstrued the claim term. Your Honor, this is primarily a factual issue. This is primarily comparing her claim construction, which in and of itself is not objectionable, what she entered in her Markman order, comparing it to the facts as to what the computer is doing as laid out, for example, by Dr. Burns. Our primary objection was that she disregarded what Dr. Burns said for procedural reasons and we think that unambiguously, if those are accepted, and particularly if the mirror image in opposition to Sonicide's summary judgment motion were accepted, there is plainly a fact issue at this point. On precisely the issue, the court found that summary judgment should be entered and this is the prediction according to the noise model. I'd like to turn briefly to the 415 and 225 patents. I see that I'm already into my rebuttal time. So I take it that the ones? No, Your Honor. I think that they're the ones that are the clearest. 415 is important as well because of a mistake the court made in treating this claim. Then go to the third patent. I don't want to use up more of your time. No, that's the 415 patent, Your Honor, is a method patent. It is not an apparatus patent and the district court treated it like it was an apparatus patent. There is clearly evidence in the record that in the vast majority of cases that green, the color that we're shifting towards in the claims, is shown at all high bandwidths. What the court found summary judgment based on is that the Sonicide device doesn't show green in high bandwidth, low frequency situations. Well, that's irrelevant. At least it's irrelevant to the majority of this case. Perhaps there could be some damages issues attendant to that. In certain instances, the method isn't performed. But in the vast majority of instances when the method is performed, the claim limitations are met. At a minimum, this is clearly, again, a doctrine of equivalence issue. As Dr. Burns testified, and it's really undisputed by Sonicide's expert, this high bandwidth, low frequency situation is A, very rare, and B, clinically meaningless. Well, why does it matter whether it's clinically meaningful or clinically meaningless? Isn't it a question of what the patent covers, not what doctors, aside from the patent, might think? I agree with your honor as to literal infringement. I would suggest that as to doctrine of equivalence, that a clinically meaningless, very rare circumstance is the kind of thing that an expert is entitled to take to a jury and say, this is an insubstantial difference. In your patent, what is the green color supposed to convey to the physician? In diagnostic terms, it's supposed to convey a clinically important event. Yet you say that you show green with respect to some events that are clinically unimportant. Low frequency, high bandwidth. The embodiment disclosed in the patent shows green, that one of the embodiments shows green at any high bandwidth situation. The inventors weren't concerned with the high bandwidth, low frequency situation. But I am. Why isn't it the case that if the purpose of the green is to show something that's clinically significant, that it's significant in turn that you're showing something as green that is clinically insignificant? Because it doesn't happen as a practical matter. The testimony, the exact language is, turbulence almost always occurs where there is high velocity. That's Joint Appendix 26917. The fact that it almost always depicts something that's clinically significant was sufficient for the designers of that particular embodiment. You're correct, Your Honor, that in that rare instance, whatever the opposite of almost always is, that in that instance, it would depict in green something that wasn't clinically significant. One wouldn't be able to distinguish that from a high velocity, high bandwidth. You would be able to distinguish it with further, it would require further investigation. The green wouldn't tell you. Correct, Your Honor. As far as the patent claims are concerned. Correct, Your Honor. You'd have to give you misinformation. If I can clarify that a little bit, Your Honor, what the green tells the sonographer to do is pay more attention to this area. It doesn't say there is a problem. It says there may be a problem. Let's go investigate. Yes, it could be a false positive in that rare situation. The sonographer would look at the green and say, oh, this is one of those false positive situations. Upon further investigation, I'm not- The accused device would not give that false positive. That's correct, Your Honor. In some sense, it's an advance that still practices the claims. Finally, as to the 225 patent, we believe that if the net money case had come down prior to district court's opinion- When you say it still practices the claim, that's like saying that the patent has a vehicle with five wheels and the advance is to get rid of one of the wheels. That's an advance, but it doesn't practice the five wheel patent claim. The advance was to show green as opposed to the mosaic, not to show green in high frequency as opposed to low frequency situations. The advance was, rather than having the mosaics of yellows and blues in the prior art, it's to put the green there in a gradual way until you only have green. That's what the advance was. As I said, as to the 225, and I'm running out of time, we believe, simply put, that had that opinion been issued, had the district court had the benefit of net money prior to the opinion, she never would have entered summary judgment because there's a fact issue. In this case, there's simply no factual evidence in the record that the multiple embodiments could be combined. Let's hear from Ms. Thayer and we'll restore your five minutes of rebuttal time. Ms. Thayer, good morning to you. Thank you, Your Honor. I could have just a minute. Good morning and may it please the court. I will try and focus on where the questions have been coming from because I have very different answers, of course, from Mr. Wolfe, starting with the 294. I believe that Mr. Wolfe that it's got to be a disclaimer or a blatant ambiguity for the court to look at the specification to construe the claims. That, of course, is not the law and I would refer the court to the net craft eBay case that we cited in our brief at pages 9, 10, and 13 and Verizon versus Vantage. Not because there was a prosecution disclaimer or because communications link was any more ambiguous than the verb is displayed was confusing or lacked definiteness, but simply because throughout the specification, as in the 294 patent, the one and only embodiment of the invention was a specific embodiment of a communications link. Similarly, in Verizon versus Vantage holdings, also cited in the brief, so I won't give you the citation here, there was a construction of the term localized wireless gateway system and it was construed to refer to compress, decompress, packetize voice signals. Lots of words added onto the construction. Why? Because that is what the full patent, the full description, the figures taught and it was all that was embodied in the patent. So with that, the district court did not err in its construction whatsoever. Moving to the doctrine of equivalence. What you heard was that there was no Doe-Bear ruling excluding the evidence by Dr. Burns, but there may not be a Doe-Bear ruling. What there was in the summer judgment ruling was a correct conclusion that what Dr. Burns said was correct. We need to distinguish between an expert report that gives rise to an issue of fact and an expert report that simply concludes that a claim limitation is met without any supporting evidence or any analysis. And that is what has occurred in this case repeatedly. But his report did say what his conclusion was based on. Yes, Your Honor, but if the declaration at JA 8258 and its paragraphs 34 and surrounding 32 and 33, the declaration does go through and explain how the accused products work. But if you go back and read that, you will see no place where Dr. Burns lines up structure in the patent with structure in the accused devices and gives any sort of analysis as to how they are structurally equivalent or how they function in the same way. What he says is, here is the structure and I conclude that there is infringement either literal or equivalent without any further discussion whatsoever. And so as Judge Crabb found, it was a conclusion that the limitation is met without explaining why. Because, in fact, in the accused products, there is no controller, there is no switch that connects the track ball that moves the display region with the power Doppler display. So the movement of the ball, unlike in the patent, does not affect the power, the color flow being displayed into the region of interest. The structure isn't there and that is testified to by Dr. Clark without rebuttal at JA 24318.275-78. And so on the one hand, you've got an expert who says, the structures that are contained in the 294 patent are not found anywhere in the accused products. And on the other hand, you have Dr. Burns saying, I think it's equivalent. Just reciting what the accused products do and saying, to me, that's equivalent. That does not raise an issue, a triable issue for a jury. In the context of a method patent, if, for example, you had used entirely different structures but had achieved the same end, which is that you would have shown the B image as soon as you started to, and only the B image, as soon as you started to move the ROI. And that you satisfied, let's say by hypothesis, all the requirements of Judge Kraft's claim construction, you would have infringed, regardless of how you had achieved it, correct? That is correct, Your Honor. For example, you could have a device where there is a trackball to move and then there was another button where you push the button, the power display would disappear, and then you would see B mode in place of the blood flow display. So you could have different apparatus that would achieve that. That is right. But in this case, there was not only not the same apparatus, you will look in vain for any opinion from Dr. Burns that the accused products operate in the same way or in substantially the same way as what is in the patent. There is just not a sentence about the way part of a DOE analysis. So there is no structure talked about, there is no comparison of the structures, and there is nothing about the way. He simply recites that there is a similarity in the function. That is only one of the three things that ought to be in the evidence supporting the ultimate conclusion of equivalence. Let me move on to the 859. The 859 patent has a number of requirements in claim 1, if I can just flip to it. And Sonocite moved for summary judgment on three of those, C, D, and F. Only one was discussed by the district court. We submit that the evidence below with respect to both D and F is conclusive on both literal and doctrine of equivalence. What I want to point out though, the entire argument from Mr. Wolf talked about a noise model. The court found that it wasn't a noise model and then disregarded the expert opinion about noise model. But that's not what the district court did. The district court very correctly looked at the claim element. And the claim element is not just that there be a noise model, but that the computer using current values predicts a mean noise level in each kernel. And that is what she found. There was no evidence. What there was, again, is Dr. Burns saying, well, I think setting a threshold is the same thing. I think that's equivalent. It's either the same thing or equivalent. When you say current, you mean from the particular kernel under review at the instant? Yes, Your Honor. From the operating instrument, and that is exactly what Kosinski teaches in columns 2 and 5, that the computer looks at where noise is generally generated. And here it explains that noise, primary noise source in a digital scanner, lies in the front end electronics. So the computer gets current settings and computes a mean noise level. It was undisputed that sonosite products do not have a computer that does anything like that. It does not survey the instrument. In this instance, means for the particular kernel being looked at? That is right. That is right. And so the computer is supposed to not only calculate a mean noise level for that kernel, it's supposed to calculate a mean signal for that kernel and then compare the two and then decide, is the signal that I've just received and computed the mean, is it substantially greater than the mean noise level that I have computed? And if so, I will use the signal. There is no dispute, and again, the district court did the right thing in looking at the evidence. There's no dispute that there is no mean noise calculated in the sonosite products. The sonosite products are hardwired to fetch a threshold, both a low and a high threshold. The high threshold actually throws out signal. For every kernel? No, for every pixel. For every pixel. For every pixel. It has a threshold that's already been pre-wired in there. It doesn't change as you go from pixel to pixel? Each pixel will have a threshold, and each pixel as the instrument is scanned will receive a signal, and those will be compared, and any signal that is over this threshold is used. Now, Dr. Burns says, well, that threshold in my view, that's a noise model. That is filtering noise. But what he never did, he never went and measured any aspect of any instrument to say, well, if I actually compute the predicted noise level, does it bear any relationship whatsoever to sonosite's threshold? He didn't do that, but Dr. Clark did, and Dr. Clark's declaration, which is in the joint appendix, shows that there is no relationship between the threshold used by sonosite and noise, and that is because automatic gain control is not in and of itself about noise. It is about increasing contrast, and that is also in the Clark declaration. I'll get you the sites in just a second. It's deciding when do I want to make a bright spot a little bit brighter and a dark spot a little bit darker. Noise, according to GE, noise is unwanted signal that is not representative of tissue. In the sonosite products, they are simply deciding what signal from tissue they want to make brighter and which darker. It's not about noise, and that's what the district court correctly concluded, that Dr. Burns coming in and saying, well, a threshold, I think that operates like a noise model, does not have an evidentiary basis that allows this to go to the jury, either as a matter of literal infringement or doctrinal equivalence. Our brief points out exactly why doctrinal equivalence is not available here. Claim one was amended to add all of these steps, to calculate the mean noise level, to calculate the mean signal, compare them, calculate a mean row threshold, that all of those were added to gain allowance. There is no equivalence available here. She said somewhere in her opinion that the model had to produce statistics, I believe. So I guess part of your argument is that in your device there are no statistics produced by a model. None whatsoever, and the noise statistics comes directly out of the Moe patent. And when it's talking about what it means to, it's column two, lines 40 through 45, what it means to predict a noise level using a noise model. It's undisputed that Sonosite's products do not do any of these steps. Rather, Dr. Burns says, well, I think a threshold is sort of like a mean noise threshold, excuse me, a mean noise level, and getting the value of the pixel is like getting a mean, and it's sort of like- Do I understand you correctly when you suggested that whatever GE's experts said, that in the context of what Dr. Clark said, GE's experts' views have to be seen as conclusory and without any kind of substantial foundation? That is right, and I would cite, Your Honor- In other words, if Dr. Clark's declaration was not in the picture, you might agree with GE, but because of what Dr. Clark said, you don't. Well, no, I think this is very much like Arthur Collins versus Northern Telecom. That is not in the briefs, but it's a situation where an expert opines that the claim element is met. This was 216F3, 1042- It was essentially just saying, the expert just saying, the claim element is met. There wasn't any elaboration on that. Well, there was elaboration that the expert said, well, the accused devices have J-net and E-net switching fabric, and by golly, that's a TST switch. But the district court first, and then, excuse me, Your Honor, looked below the evidence to say, well, wait a second, you're saying the TST switch is there, but when we look at the evidence to support that conclusion, it isn't there, and that is exactly the situation where you look underneath the conclusion, there is no evidence, and Dr. Clark does explain that the missing evidence is missing. This is what I was trying to get at. You're not saying that Dr. Clark's analysis or conclusions are more persuasive and therefore somehow negate the GE witness. You're just saying that the GE witness assertions are not adequately supported and therefore can't raise a triable issue. That is correct, Your Honor. And that Dr. Clark's declaration simply helps one understand why that's so, but it's not a question of Clark overpowering the GE witness. Not at all.  And just gave the district court more clarity as to why the conclusory opinions were incorrect. Yes, Your Honor, I would be delighted to do so, and I'd like to start with this notion that the inventors weren't concerned with high bandwidth and low frequency. There is no testimony to that effect. What we have is the inventor's patent, and what that patent says is that any time there is either turbulence or high velocity aliasing, use the single second color. And that, the patent teaches, is the invention. That's what distinguishes it from the prior art. What are they trying to tell the clinician? In the high bandwidth situation, we know that the velocity cannot be determined with any degree of confidence. And you don't want to go predicting disease and that sort of thing when you don't have confidence. So essentially green in the invention, I take it, says don't trust this data. That is exactly right, and Your Honor. And in your system, you have something that they call green. They say it almost never appears. But setting that aside, that they would make green, you don't make green, even though they assert that data is unreliable. And you agree that the data is unreliable at the high bandwidth, low frequency range. Correct? Am I right as to all that? Unreliable. It is unreliable if what you're trying to get from it is the velocity of the flowing blood. It may be reliable in other things. I'm not a physician, Your Honor, but it is unreliable in that you cannot say, I know how fast that blood is flowing. And you either don't know how fast it's flowing because of aliasing, because it's flowing so fast. It's like when you see a wheel. It's either flowing. It does have one speed, but it's so fast you can't measure it. Or there are so many different velocities going in different ways that you can't predict a mean velocity with any degree of confidence. And this patent says, in that situation, single second color. And it is defined as the invention. Figure 5 is said to be the best illustration of the color map of the invention. And more equally importantly, if you look at dependent claim 4, it talks about using a range of colors for the first color. Remember that we've got first colors, blue and red, and then as bandwidth increases you go to a single second color. Claim 4 says, by the way, for those first colors, you can vary them depending on the mean frequency. Nowhere in the claims does it say, well, you know what, for that high bandwidth, that second color, you could vary that second color based on mean frequency. Precisely what Mr. Wolfe is saying should be an equivalent. He's saying, well, actually the high bandwidth, you could vary it with mean frequency so that you only have green at the very high frequency, very high bandwidth. That's not in this patent. It's not what the inventors taught. They taught just the opposite. Only said single second color at high bandwidth. And you think that there's no doctrinal equivalence because? Because it would vitiate the claim element, as the court found. The claim element at high bandwidth only said single second color is shown. This is like the cases... That's like saying that if a patent claims a car that is only green, that someone who comes in and paints a small segment of the underside of the front fender yellow, that there can't be any infringement of the doctrinal equivalent because there's the word only. It would vitiate the only green limitation. Yes, but when your patent says, as it does in column 6, starting at line 67, excuse me, 58, that this invention is in contrast to the prior art where multiple colors were shown at high bandwidths, I say you're darn tootin' that the doctrine of equivalence doesn't let you come back and recapture if somebody doesn't use only a single second color at the high bandwidths. And again, it's column 6 where the prior art is distinguished precisely because multiple colors were used, not just a single color when you hit the high bandwidths. In this case also, and I would refer you to the opening summary judgment brief at 29 through 30, the cases that say minority can't be majority, can't be equivalent to majority, two-dimensional is not equivalent to one-dimensional, multiple is not equivalent to only single second color. Finally, on 225, net money, if it had been decided before, would have had absolutely no effect on the outcome of this case because in this case there is no combination of exclusive embodiments. The fallacy of GE in its analysis is it says, look at the figures and disregard the text of the patent. And if you're honest, we'll look at, if I can open it up very quickly, figure 2 of that patent. I'm sorry, I don't have the 684. Figure 2 has a, here it is, it's in our opening brief, has a method that you provide the ultrasound with a disabled feature and then supply the ultrasound device with a key that's operative to enable this disabled figure. When you go to the text of the patent, and this is all cited in our brief, it explains that element 220, which is supply the ultrasound device with a key, you can do that in two different ways and those are shown in figures 3 and 4. The text of the patent goes on to explain that for the local embodiment, which is figure 3, the key preferably has encoded into it the feature to be enabled. So what GE does is it just looks at figure 3 and says, well, it says that the operator is going to turn on the machine and select the feature and therefore the key must not already have the feature encoded in it. But the patent specification, when referring to figure 2 and figure 3, says just the opposite. And so when you read the figures in conjunction with the text, which of course is the law, the fact that the key must embody this option identifier is right there in the text, referring to figure 2 and to figure 3. And therefore the district court got it absolutely right. The claims are anticipated. Thank you, Your Honor. Thank you, Mr. Wolf. Thank you, Your Honor. Your Honor, I would note that with reference to the 294 patent, counsel did not attempt to point with the always-never limitations to any textual support whatsoever. And that, of course, is because there is not. In the absence of limitation, counsel pointed you to the Netcraft case and the Verizon case, and those are precisely the sorts of circumstances that I talked about in the first instance where a summary of the invention becomes relevant to claim construction. In Netcraft, for example, the court took the phrase communication link and swapped that out for language that they thought the district court thought more appropriately captured the invention. It defined the term communication link. Here there's no words being defined. There are simply limitations being imported. As to the 859, you heard counsel repeatedly use the word calculate, that the noise model needs to be calculated. No. The patent doesn't call, at least the claims at issue don't call, for the calculation of a noise model. It's about the use of a noise model. The noise model can be complicated. The noise model can be simple. What you need to do with a noise model is predict where the threshold is above or below. I thought Judge Crabb concluded that you didn't have a noise model at all. Not anything she would construe as a noise model. Your Honor, Judge Crabb did do that based on how the engineers arrived at the number. As I suggested in my opening remarks, I don't believe her inquiry as to infringement was focused on the right place. She was focusing on how the engineers arrived at that threshold, their noise model, rather than how the computer used it. Of course, Dr. Burns stated in great detail why it was a noise model. I'll just point the court to Joint Appendix 17003, which is substantial deposition testimony on this topic, and also 16283 through 16284, which is an example of the declaration and reports. I would submit to Your Honor that if that constitutes conclusory testimony, if that doesn't pass the threshold of conclusory, then my client's litigation costs are going to go through the roof. Because if pages and pages of deposition testimony and pages and pages of reports aren't sufficient to explain the basis of an expert's report, we're going to have books for expert reports, not merely documents. I think by any measure, Dr. Burns' opinion that this patent involves the prediction, not the calculation of a noise model, and that the sinusoid product predicts using a noise model, if that's not sufficient, I'm not sure what would be. I thought it was a noise level that has to be predicted by the model. Correct, Your Honor. You must use the noise model to predict the noise level, and that's precisely how sinusoid products work. The mean noise level. The mean noise level. How is that limitation satisfied in the case? Your Honor, here there's no dispute. Dr. Clark agrees that there's a mean noise level as well. The mean of 11 being 11? The point is that the device says we can have a kernel. We start with the analysis done on a kernel-by-kernel basis. We can have 20 pixels in a kernel, or we can have one. What the patent says is that one of the steps is you figure out what the mean pixel intensity in a kernel is. Sinusoid shows to only use one pixel per kernel. In other systems, you could have 25. It's irrelevant to the algorithm of the claim. It's a quirk here that the mean of 11 is 11, but first of all... It's sort of nonsensical. Dr. Clark, their own expert, disagrees with that proposition. I read his testimony. I don't know if he disagrees. As a technical... Either way, Your Honor, but the point is because a kernel can contain any number of pixels, you calculate the mean of the kernel, and if you so happen to choose one pixel per kernel as Sinusoid did, well then you're left with figuring out the mean of the... The result, the reason we're here is because the claim is broad enough to encompass any number of pixels per kernel. They chose one pixel per kernel. That leaves us in a slightly technical position of saying what's the mean of a single number, but that doesn't get you out from what the patent is trying to do, which is to use then that kernel noise level, compare it to signal, and then bring the loud picture down and the noisy picture up and create a uniform, easily used, easily reviewed picture. I want to talk briefly about the 415. Counsel talked about turbulence and aliasing, and I would note that aliasing only occurs at high frequencies. So by definition, if the problem is aliasing that we're talking about, you have both high bandwidth and high frequency, in which case Sinusoid's product only shows green, just like the patent calls for. So there's no dispute that in the second condition that counsel was talking about, that falls well within the patent's purpose and the patent's plain language. Finally, I would note, with regard to the 225 patent, that I believe that counsel misstated the content of the 684 patent. If you look at, and this is the prior art, if you look at column 3, line 20, it states, then the user selects the feature to be enabled. It's the user, not the option identifier, that selects the feature. So that embodiment can't anticipate the claims. I believe counsel was referring to another embodiment that appears at column 4, line 45, and that embodiment does talk about an option identifier, but that's of course precisely the point of net money. If you have two different embodiments, absent undisputed facts, you can't combine them on summary judgment. Here we have no factual record whatsoever suggesting that these embodiments can be combined. No expert testimony in this record, no testimony of any kind. And with that, barring further questions, thank the court. All right. We thank both counsel. We'll take the appeal under submission. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.